IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

**ED NIEMI OIL COMPANY, INC.**,

      Plaintiff,

  v.

**EXXON MOBIL CORPORATION**,

      Defendant.

No. 3:11-cv-00214-MO

OPINION AND ORDER

**MOSMAN, J.**,

    Ed Niemi Oil Co., Inc. ("Niemi") brings this action seeking contribution from Exxon Mobil Corporation ("Exxon Mobil" or "Exxon") for costs Niemi incurred in cleaning up hazardous substance contamination on two sites formerly leased or owned by Exxon Mobil, and a declaration that Exxon Mobil is liable for future remedial action costs. Exxon Mobil brings two counterclaims seeking contractual indemnification and contribution from Niemi for remediation costs incurred and future remedial action costs. Exxon Mobil moves for summary judgment on Niemi's contribution and declaratory relief claims. Niemi moves for summary judgment on its claims, arguing that Exxon Mobil is liable for contribution and Niemi is entitled to declaratory relief as a matter of law. Because genuine issues of material fact exist as to each party's liability, Niemi's motion for summary judgment is denied, and Exxon Mobil's motion for summary judgment is denied in part and granted in part.

1 – OPINION AND ORDER

# BACKGROUND

This dispute concerns the allocation of remediation costs incurred in cleaning up petroleum contamination at two sites, a gasoline service station and a bulk petroleum storage plant, in Astoria, Oregon.

## I.     Bulk Plant Site

Exxon Mobil and its predecessors began leasing the bulk petroleum storage facility ("Bulk Plant Site") from the Port of Astoria in approximately 1925. (*See* Bakalian Decl. [34-1] Ex. 5 at 3.) Over the years, Exxon Mobil made several improvements to the Bulk Plant Site, including installing numerous above ground storage tanks ("ASTs") for the purpose of storing and distributing petroleum products. (*Id.* [34-1].)

J. Ed Niemi first worked at the Bulk Plant Site as a night watchman and delivery driver in the 1920s. Around 1945, Mr. Niemi, under the name J. Ed Niemi, Distributor, began distributing petroleum products for Exxon Mobil's predecessor, Mobil Oil. (*See* Bakalian Decl. [32-1] Ex. 4–26.) The parties dispute the extent to which Mr. Niemi operated his business out of the Bulk Plant Site, and the extent of his control over the Bulk Plant during this period.

In 1966, Niemi Oil Co. subleased the Bulk Plant Site from Exxon Mobil. (Carlton Decl. [27-2] Ex. 1 at 89–90.) This lessor-lessee relationship continued until 1976, when Exxon Mobil terminated its lease with the Port of Astoria and sold many of the improvements on the property to Niemi's related entity, ETU, Inc. (*Id.* [27-2] Ex. 1 at 102–03.) On July 13, 1976, Niemi leased a portion of the Bulk Plant Site from the Port of Astoria until the late 1990s, when the Port of Astoria cancelled the lease and Niemi vacated the site. (*See* Carlton Supp. Decl. [36] Ex. 2; *see* Answer [10] ¶ 27.)

In the 1990s the Oregon Department of Environmental Quality ("DEQ") identified substantial soil and groundwater contamination on Astoria properties, including the Bulk Plant

2 – OPINION AND ORDER

Site. In 2001, DEQ issued a unilateral order to Niemi and several other companies, not including Exxon Mobil, ordering them to undertake a remedial investigation and clean up the contaminated properties. (Harrington Decl. [34-5] at 2; Carlton Decl. [27-2] Ex. 1 at 40–76.)

In 2003, Exxon Mobil became involved in the cleanup of the Bulk Plant Site, and began sharing in the costs associated with the investigation and remediation of the site.

## II. Hiway Service Station

Exxon Mobil's predecessor purchased the gasoline service station on Marine Drive in Astoria ("Hiway Service Station") in 1945. (Bakalian Decl. [34-1] Ex. 5 at 13–14.) In 1965, Niemi leased the Hiway Service Station from Exxon Mobil and began operating the service station. (*Id.* [34-1].) In 1978, Niemi purchased the Hiway Service Station from Exxon Mobil, and operates it to this day. (*Id.* [34-1].)

In 1999, while Niemi was in the process of removing an underground waste oil tank that predated its purchase of the Hiway Service Station, environmental consultants discovered petroleum contamination in the soil as well as groundwater. (Bakalian Decl. [34-2] Ex. 6 at 3–4.) Niemi contracted to investigate the contamination and, after submission of the report, DEQ determined that no further remedial action was necessary. (*Id.* [34-2] Ex. 7.)

## APPLICABLE LAW

### I. Standard of Review

On cross-motions for summary judgment, the court "evaluate[s] each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences." *ACLU of Nev. v. City of Las Vegas*, 466 F.3d 784, 790–91 (9th Cir. 2006) (quoting *ACLU of Nev. v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003)). Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the

3 – OPINION AND ORDER

court of the basis of its motion and providing evidence in support of its motion that demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

"If the moving party meets its initial burden of showing 'the absence of a material and triable issue of fact,' 'the burden then moves to the opposing party, who must present significant probative evidence tending to support its claim or defense.'" *Intel Corp. v. Hartford Accident & Indem. Co.,* 952 F.2d 1551, 1558 (9th Cir. 1991) (quoting *Richards v. Neilsen Freight Lines*, 810 F.2d 898, 902 (9th Cir. 1987)). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Celotex*, 477 U.S. at 322–23.

The substantive law governing a claim determines whether a fact is material. *T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The court should view inferences drawn from the facts in the light most favorable to the nonmoving party. *Id.* at 631. If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support the claim than would otherwise be necessary. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

## II.     Oregon Hazardous Waste Act

The Oregon Hazardous Waste Act imposes strict liability on certain classes of parties for remedial action costs incurred by a release of hazardous waste. Or. Rev. Stat. § 465.255(1). Potentially liable parties include:

a) Any owner or operator of the facility at the time the acts occurred that resulted in the release;
b) Any owner or operator who became the owner or operator after the time of the acts that resulted in the release, and who knew or reasonably should have known of the release when the person first became the owner or operator;

      c) Any owner or operator who obtained actual knowledge of the release at the facility during the time when the person was the owner or operator of the facility and then subsequently transferred ownership or operation of the facility to another person without disclosing such knowledge;

      d) Any person who, by any acts or omissions, caused, contributed to or exacerbated the release, unless the acts or omissions were in material compliance with applicable laws, standards, regulations, licenses or permits; and

      e) Any person who unlawfully hinders or delays entry to, investigation of or removal or remedial action at a facility.

*Id.* § 465.255(1)(a)-(e). Such parties are known as "potentially responsible parties" or "PRPs". As relevant here, the elements of potential liability as an owner are (1) the party was an owner or operator; (2) of a facility; (3) from which there was a release; (4) which caused the incurred response costs. *Oregon ex rel. Dept. of Environmental Quality v. Spar Investment Co.*, 2004 WL 2110704, at *8 (D. Or. Sept. 21, 2004) (citing *California v. Campbell*, 319 F.3d 1161, 1165 (9th Cir. 2003)). "Owner or operator" is defined to include "any person who owned, leased, operated, controlled or exercised significant control over the operation of a facility." Or. Rev. Stat. § 465.200(20).

      Any PRP who incurs remedial action costs may seek contribution from any other liable or potentially liable party. Or. Rev. Stat. § 465.257(1). A PRP seeking contribution from another PRP under an "owner or operator" theory need not prove the occurrence of a specific release, or that the defendant caused the release, but rather merely that a release occurred while the defendant PRP was an owner or operator of the facility that caused incurred response costs. *See Graham v. State*, 995 P.2d 1167, 1172 n.4 (Or. App. 2000). Once potential liability has been established, the court determines the share of remedial action costs to be borne by each party using equitable factors, including those listed in Or. Rev. Stat. § 465.257(1)(a)-(k).

## ANALYSIS

I. <u>**Bulk Plant Site**</u>

  A. *Potential Liability*

Determining much of the parties' potential liability in this case is fairly straightforward. Exxon Mobil is potentially liable for remediation costs incurred as a result of releases which occurred while it leased the Bulk Plant Site from the Port of Astoria from 1925 until 1976. *See* Or. Rev. Stat. §§ 465.200(20), 465.225(1)(a). Absent evidence of being the cause of a particular release, Exxon Mobil is not a PRP for any contamination that occurred after the cancellation of the lease with the Port of Astoria and sale of equipment to Niemi in 1976.

Similarly, Niemi is potentially liable for remediation costs incurred as a result of releases which occurred while it leased the Bulk Plant Site from 1966 through 1997, first as a sublessee from Exxon Mobil and later as the prime lessee from the Port of Astoria.

Whether Niemi was an owner or operator of the Bulk Plant before 1966 requires additional discussion. Exxon Mobil points to a May 25, 1951, application for premises liability insurance for Mr. Niemi that includes a box checked by Exxon Mobil's predecessor that indicates the insurance "[i]s to be included in revised bulk plant rental." (Carlton Decl. [27-4] Ex. 3.) Additionally, Exxon Mobil points to an undated newspaper advertisement that traces Niemi back to its predecessors, and indicates that Niemi was based at the Bulk Plant at the time of publishing. (Carlton Decl. [27-1] Ex. 1 at 6–9; Carlton Decl. [27-2] Ex 1. at 77.) Notably, however, the advertisement's timeline of the history of Niemi includes an event in 1970. (*Id.* [27-1]; *id.* [27-2].) Exxon Mobil's strongest evidence of Niemi's presence at the Bulk Plant is a 1946 Astoria City Directory entry listing J. Ed Niemi, Distributor with the Bulk Plant office telephone number. (*Id.* [27-1] Ex. 1 at 12; *id.* [27-2] Ex. 1 at 80–87.)

Niemi, on the other hand, maintains that it did not lease the Bulk Plant until 1966, and points to the lack of any lease agreement between Exxon Mobil and Niemi before 1966, and the lack of any other mention of a lease agreement in two decades of distributor agreements between Niemi and Exxon Mobil. (*See* Bakalian Decl. [32-1] Ex. 4–26.)

### B.    *Exxon Mobil's Motion*

For purposes of Exxon Mobil's Motion for Summary Judgment, I view the facts in the light most favorable to Niemi. *See T.W. Elec. Serv.,* 809 F.2d at 631.  A single box checked by an Exxon Mobil employee and a newspaper advertisement published after 1970 listing Niemi's address at the Bulk Plant cannot conclusively establish that Niemi was an owner or operator of the Bulk Plant before 1966.  This is especially true in light of the extensive documentation of distributor agreements between Niemi and Exxon Mobil during this period that make no reference to any lease of the Bulk Plant.  That Niemi was listed at a telephone number associated with the Bulk Plant only shows that Niemi conducted some business out of the Bulk Plant during this period, not that it "owned, leased, operated, controlled or exercised significant control over" the Bulk Plant.  *See* Or. Rev. Stat. § 465.200(20).  Based on the record before me, then, I cannot conclude as a matter of law that Niemi is potentially liable as an owner or operator of the Bulk Plant for remediation costs caused by releases that occurred before 1966.  A genuine issue of fact exists as to Niemi's potential liability as an owner or operator before 1966.

#### 1.    **Proof of a Release**

In its Motion for Summary Judgment, Exxon Mobil argues that Niemi has failed to identify any release of hazardous materials for which Exxon Mobil is potentially liable.  Simply put, Exxon Mobil maintains that Niemi has failed to create a genuine issue of fact as to whether there was a release of hazardous materials during the period of its ownership or operation of the Bulk Plant.  This argument is unavailing.

7 – OPINION AND ORDER

It is undisputed that petroleum products were stored at, and dispensed from, the Bulk Plant during the period of Exxon Mobil's ownership. It is also undisputed that the DEQ ordered Niemi and other companies to investigate and clean up contamination caused, in large part, by releases of petroleum products. (Carlton Decl. [27-2] Ex. 1 at 40–56; Harrington Decl. [34-5] at 2.) In addition, Niemi submitted several declarations from first-hand witnesses and experts in bulk petroleum storage.

Niemi submitted two declarations from Alice Codd, a former employee of Niemi from 1968 through 1996, who worked as a bookkeeper at the Bulk Plant. (Codd Decl. [32-2] at 3; Codd Decl. [49] at 1.) Ms. Codd stated that "Niemi did not own any of the petroleum product or inventory at the bulk plant. The petroleum products were delivered, stored and owned by Mobil. Niemi would purchase product from Mobil for distribution to its gas station, commercial and residential customers." (Codd Decl. [49] at 2.) According to Ms. Codd, Exxon Mobil would offload petroleum products from a barge or tanker truck, and store them at the Bulk Plant, where it would sell the product to other distributors and consumers. (Codd Decl. [32-2] at 4, 6.) Exxon Mobil's employees were responsible for all of the delivery operations, including connecting and disconnecting product lines and hoses. (*Id.* [32-2] at 5.) In 1976, Ms. Codd stated that ETU, Inc., a corporation she formed with Warren Bechtold, then-president of Niemi, bought the equipment remaining at the Bulk Plant from Exxon Mobil, but then re-sold the four largest storage tanks, and continued operating at the Bulk Plant in a "greatly reduced fashion." (*Id.* [32-2] at 6.) Niemi leased the Bulk Plant from the Port of Astoria in 1976. (Carlton Dec. [36-2] Ex. 2.)

Niemi submitted a declaration from John Kurtis Harrington, a licensed professional engineer hired by Niemi as an environmental consultant to work on the remedial investigation

and cleanup of the Bulk Plant.  Mr. Harrington submitted a declaration stating that "[p]etroleum impacts to the [Bulk Plant] Site occurred due to releases resulting from historical operations at the Site."  (Harrington Decl. [34-5] at 2.)  Mr. Harrington further stated that "elevated levels of gasoline- and diesel-range hydrocarbons were detected in subsurface soil samples collected near the large petroleum fuel ASTs and product dispensing facilities formerly located at the Site."  (*Id.* [34-5] at 3.)  Additionally, Mr. Harrington noted that a "[r]eview of the chemical analytical laboratory's gas chromatography with mass spectrometry detection . . . analysis indicates that residual petroleum contamination found in soil beneath the Site is highly weathered and is likely indicative of an older release(s)."  (*Id.* [34-5].)  Similarly, with respect to groundwater contamination at the Bulk Plant, Mr. Harrington stated that "[b]ased on my review of the [remedial investigation] data and distribution of the [light nonaqueous-phase liquid], the majority of residual contamination beneath the Site appears to have originated from the AST(s) located at the northeastern portion of the former Mobil Bulk Plant."  (*Id.* [34-5] at 4.)

In addition to Mr. Harrington's declaration, Niemi submitted a declaration from Larry Gregory, a construction and maintenance engineer for Exxon Mobil from 1972 to 2010. (Gregory Decl. [47] at 1.)  Mr. Gregory worked for Exxon Mobil in the Portland area from 1974 to 1977, and during that time "had responsibility for maintenance and construction of Mobil's service stations and bulk oil storage facility tanks in the Oregon sales district."  (*Id.* [47] at 1–2.) Mr. Gregory stated that he recalled visiting the Bulk Plant after a report of a large release of gasoline sometime between 1975 and 1977.  (*Id.* [47] at 2–3.)  Mr. Gregory reported that during his career he had responsibility for identifying and controlling leaks and spills from underground and above ground storage tanks at service stations, and that he is aware from his experience working for Mobil Oil that "spills and releases *regularly occur* on a small scale like drips from

9 – OPINION AND ORDER

hoses and nozzles and occasionally on a larger scale from pipe or tank leaks or surface spills." (*Id.* [47] at 3–4 (emphasis added).)

In addition, Niemi submitted a declaration from Clement Mesavage, a consultant with 38 years of experience in the "midstream portion of the petroleum and chemical industry characterized by its bulk liquid ('tank farm') facilities that store and transfer petroleum." (Mesavage Decl. [48] at 1–3.) Mr. Mesavage reviewed documents relating to the Bulk Plant Site. (*Id.* [48] at 4.) Based on his review of the "environmental report lab data," Mr. Mesavage noted that methyl tertiary butyl either (MTBE) was not present in the groundwater. (*Id.* [48] at 6.) Mr. Mesavage stated that MTBE was an additive in gasoline used between 1979 and 1995, and its absence in the lab data "suggests that there were no significant spills or leaks of gasoline since about 1979." (*Id.* [48].)

Finally, Niemi submitted a declaration from Anthony Rieck, a consultant with 34 years of experience in the petroleum industry, including tank inspection and repair, as Executive Director of the National Leak Prevention Association, and as a consultant providing petroleum safety and compliance services. (Rieck Decl. [32-3] at 2–3.) Mr. Rieck reviewed documents relevant to the Hiway Service Station and the Bulk Plant. As to the Bulk Plant, Mr. Rieck stated that standard industry practices at such bulk plants in the 1960s and 1970s often resulted in the release of petroleum products. (*See id.* [32-3] at 5–12.)

Seen in the light most favorable to Niemi, the above declarations and undisputed facts create a genuine issue of material fact as to Exxon Mobil's liability. Niemi need not prove either the occurrence of any particular release, or that Exxon Mobil caused it. Rather, it must prove that a release occurred during Exxon Mobil's period of ownership that caused the incurrence of

remediation costs. *See Graham*, 995 P.2d at 1172 n.4. A rational jury could conclude from the above that Niemi has met this burden.

### 2. Indemnity

Exxon Mobil next argues that indemnity clauses in the Bulk Plant lease agreements require Niemi to indemnify Exxon Mobil for any liability incurred as a result of petroleum contamination at the Bulk Plant. The indemnity provisions read:

> Lessee agrees to indemnify Lessor against all claims, losses and liabilities arising out of damage to property (including property of the parties) or injury to, or death of, persons (including Lessee) occasioned by, or arising out of, (a) the use or condition of the premises, the improvements and equipment thereon or any motor vehicle used in connection with the business conducted at the premises, (b) acts or omissions of Lessee or Lessee's agents or employees, (c) Lessee's non-performance of this lease, or (d) the storage or handling of products on the premises.

(Carlton Decl. [27-2] Ex. 1 at 89, 96.)

Under Oregon law, "[i]n interpreting a contractual provision a court first examines the text of the disputed provision in the context of the document as a whole, and determines, as a matter of law, whether the provision is ambiguous." *Riverside Homes, Inc. v. Murray*, 214 P.3d 835, 841(Or. App. 2009) (internal citation omitted). When making this determination, "[t]he court may consider extrinsic evidence of the circumstances underlying the formation of the contract." *Id.* (internal citation and quotation omitted). "If, after this first step, the contractual provision is clear, the analysis ends. If it remains ambiguous, the court then examines extrinsic evidence of the contracting parties' intent. Finally, if those two analytical steps have not allowed the court to resolve the ambiguity, the court applies appropriate maxims of contract construction to determine the parties' intent." *Id*. (internal citations omitted).

I conclude the language of the indemnity provision above unambiguously requires Niemi to indemnify Exxon Mobil for remediation costs incurred due to contamination that occurred

11 – OPINION AND ORDER

during the period of the lease.  The indemnity clause specifically provides that Niemi must indemnify Exxon Mobil for "*all* claims, losses and liabilities arising out of damage to property (including property of the parties) . . . arising out of, (a) the use or condition of the premises . . . or, (d) the storage or handling of products on the premises." (Carlton Decl. [27-2] Ex. 1 at 89, 96 (emphasis added).)  While liability arising from soil and groundwater contamination may not have been a common problem in 1966 when the original lease was signed, the inclusive word "all" includes liabilities known and unknown at the time.

Niemi argues that the indemnity provision should be read in the context of a maintenance provision in the lease.  Niemi maintains that because Exxon Mobil was responsible for maintenance of the storage tanks, the indemnity provision should not be read to require Niemi to indemnify Exxon Mobil for contamination caused, at least in part, by that maintenance.  The maintenance provision provides:

> Lessor, at its expense, shall make all repairs (including painting) and replacements necessary to keep the premises in good order and condition unless the necessity therefor is due to the negligence or misconduct of Lessee or Lessee's employees or agents.  If Lessor fails to make such repairs and replacements, Lessee's sole remedy shall be the right to terminate this lease.
>
> Except to the extent Lessor shall make repairs or replacements as above provided, Lessee at its expense shall maintain the premises in good, safe, clean and sanitary condition at all times and make all repairs and replacements necessary for that purpose.  If Lessee does not so maintain and repair the premises and make necessary replacements, Lessor at its option may do so and the cost thereof shall be paid by Lessee.  *Lessor shall not be liable for losses to Lessee's business resulting from any repair or replacement work performed by Lessor or from any delays in commencing or completing such work.*

(Carlton Decl. [27-2] Ex. 1 at 89, 96 (emphasis added).)  While Niemi is correct that contractual provisions are interpreted in context of the document as a whole, the context provided by the maintenance provision does not change the interpretation of the indemnity clause.  *See Riverside Homes, Inc.*, 214 P.3d at 841 (providing that contractual provisions are interpreted in the context

12 – OPINION AND ORDER

of the contract as a whole).  The parties at the time of contracting very well could have contracted to require Niemi to indemnify Exxon Mobil for any liability arising from Exxon Mobil's maintenance of the tanks; at least to the extent Exxon Mobil performed the maintenance non-negligently.  This is consistent with the last sentence of the maintenance provision, which provides that Exxon Mobil is not liable to Niemi for losses to Niemi's business resulting from Exxon Mobil's maintenance.  Thus, my reading of the indemnity clause is not inherently inconsistent with the maintenance provision.  Therefore, the maintenance provision does not change the unambiguous meaning of the indemnity clause.

Finally, Niemi relies on cases holding that indemnity provisions should not be read to require a plaintiff to indemnify a defendant for the defendant's own negligence.  *See, e.g.*, *Cook v. Southern Pac. Transp. Co.*, 623 P.2d 1125, 1128 (Or. App. 1981), *rev. denied*, 631 P.2d 340.  With the exception of some evidence relating to a spill in the mid-1970s, Niemi has submitted no evidence that Exxon Mobil negligently maintained the storage tanks or other equipment, or otherwise negligently caused a release.  To the contrary, Niemi submitted a declaration suggesting that such releases were routine consequences of such maintenance and in compliance with industry practice at the time.  (*See* Rieck Decl. [32-3] at 5–12.)  Absent a showing that Exxon Mobil was negligent in causing particular releases which led to the incurrence of remediation costs, the indemnity clause requires Niemi to indemnify Exxon Mobil for remediation costs caused by contamination during the period of the lease.

Exxon Mobil argues that the indemnity provision requires Niemi to indemnify Exxon Mobil for remediation costs regardless of when the contamination occurred.  But there is nothing in the lease agreements suggesting that Niemi must indemnify Exxon Mobil for past liability.  By

13 – OPINION AND ORDER

its own terms, the indemnity clause only applies to remediation costs caused by contamination during the period of the lease.

I also reject Exxon Mobil's argument that the 1976 Bill of Sale for the equipment remaining at the Bulk Plant requires Niemi to hold Exxon Mobil harmless for all past contamination. By its terms, the 1976 Bill of Sale provision cited by Exxon Mobil only applies to Clean Water Act regulations governing oil pollution *prevention*, not remediation of past contamination. (Carlton Decl. [27-2] Ex. 1 at 102.) The other Bill of Sale provision cited by Exxon Mobil only requires Niemi to hold harmless and indemnify Exxon Mobil for liability arising out of the use or condition of the above ground storage tanks *arising after* the date of the Bill of Sale. (*Id.* [27-2] Ex. 1 at 102–03.) The 1976 Bill of Sale is inapplicable to liability for preexisting soil and groundwater contamination.

### C.    *Niemi's Motion*

Niemi's motion for summary judgment is not merely the flip side of Exxon Mobil's. Rather, due to the nature of the claims Niemi moves for summary judgment on, it necessarily seeks the allocation of liability. Because the undisputed facts are insufficient to allow me to apportion liability, summary judgment is inappropriate on Niemi's claims. The issues of when the releases occurred, and which contamination caused the incurrence of remediation costs are replete with genuine issues of fact.

Considering many of the occurrences at issue are very old, witnesses have passed away, memories have faded, and documents have been lost or destroyed, it is likely any liability allocation I would ultimately engage in would necessarily be imprecise. Nonetheless, because I cannot conclude as a matter of law that Exxon Mobil is not liable for any of the remediation

costs at the Bulk Plant, and because there are genuine issues of fact as to the allocation of liability, summary judgment is inappropriate.

## II.     Hiway Service Station

### A. *Contribution Claims*

The analysis for the Hiway Service Station largely mirrors that for the Bulk Plant. Exxon Mobil is potentially liable as an owner for remediation costs caused by contamination that occurred from the time Exxon Mobil's predecessors purchased the Hiway Service Station until 1978 when Niemi's affiliate, ETU, Inc., purchased the Site. Niemi is potentially liable as an owner or operator for remediation costs caused by contamination that occurred from the time Niemi began leasing the Hiway Service Station from Exxon Mobil in 1965, through its purchase in 1978, until the waste oil tank's removal in 1999.

Exxon Mobil's argument that there is no evidence of a release at the Hiway Service Station for which it is liable is unavailing. It is undisputed that Niemi incurred investigation costs due to petroleum contamination in the vicinity of an underground waste oil storage tank ("waste oil UST"). It is undisputed that the waste oil UST was in use during the period for which Exxon Mobil is potentially liable, including the time before Niemi leased the Hiway Service Station. In his declaration, Mr. Rieck stated that "[g]enerally, releases from waste oil tanks are the result of a cumulative series of human error events, poorly connected piping and other equipment failures over the entire lifetime of the tank service." (Rieck Decl. [32-3] at 8.) Mr. Rieck further opined "[i]t is likely that the leak of waste oil from this tank occurred prior to the period of Niemi's ownership of the service station." (*Id.* [32-8] at 9.) This is sufficient to create a genuine issue of fact as to whether a release occurred for which Exxon Mobil is potentially liable.

15 – OPINION AND ORDER

Similar to the Bulk Plant, Exxon Mobil argues that an indemnity provision in the lease requires Niemi to indemnify it for all liability. The Hiway Service Station leases contained the following indemnity provision:

> Lessee agrees to indemnify Lessor against all claims, losses and liabilities arising out of damage to property (including property of the parties) or injury to, or death of, persons (including Lessee) occasioned by, or arising out of, (a) the use or condition of the premises, the improvements and equipment thereon or any motor vehicle used in connection with the business conducted at the premises, (b) acts or omissions of Lessee or Lessee's employees, agents or tenants, (c) Lessee's nonperformance of this lease, or (d) the storage or handling of products on the premises. Lessee shall on demand present such evidence as Lessor may reasonably require of Lessee's financial ability to discharge this indemnification obligation, provided that acceptance by Lessor of any such evidence shall not limit Lessee's indemnification hereunder.

(Carlton Decl. [27-2] Ex. 1 at 106–07, 109–10, 112–13, 115–16.) Not surprisingly, this language is materially identical to the indemnity provision in the Bulk Plant leases. The Hiway Service Station leases also contained maintenance provisions materially identical to those in the Bulk Plant leases. Accordingly, as discussed above, Niemi must indemnify Exxon Mobil for any liability associated with remediation costs incurred as a result of contamination during the period of the leases.

Just as with the Bulk Plant, the issues relating to allocation of liability are rife with genuine issues of fact. Accordingly, summary judgment is inappropriate for both parties on the Hiway Service Station contribution claim for past remedial costs. There is currently no genuine issue of fact, however, regarding the necessity of future remedial actions costs. There are presently no future remedial action costs because DEQ issued a No Further Action Determination ("NFA"). (Carlton Decl. [34-2] Ex. 7 at 7.) Accordingly, Exxon Mobil is entitled to partial summary judgment on Niemi's Hiway Service Station contribution claim to the extent it claims future remedial action costs.

16 – OPINION AND ORDER

### B.  *Declaratory Relief*

Exxon Mobil is also entitled to summary judgment on Niemi's claim for declaratory relief in relation to the Hiway Service Station.  In a diversity action, the availability of a particular remedy will generally be determined by substantive state law.  The matter is different with declaratory judgments, however, because, in addition to the underlying merits of the substantive state question, the availability of the remedy turns on whether the plaintiff has Article III standing to seek declaratory relief.

"For a declaratory judgment to issue, there must be a dispute which 'calls, not for an advisory opinion upon a hypothetical basis, but for an adjudication of a present right upon established facts.'"  *Ashcroft v. Mattis*, 431 U.S. 171, 172 (1977) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 242 (1937)).  Thus, although sometimes discussed as a substantive prerequisite to declaratory relief, the requirement that a declaratory judgment only issue for an adjudication of a present right upon established facts is a jurisdictional Article III standing requirement.

Article III standing requirements apply to federal diversity actions.  *See Lee v. American Nat'l Ins. Co.*, 260 F.3d 997, 1001–02 (9th Cir. 2001).  Therefore, because the availability of a declaratory judgment partially turns on an Article III jurisdictional requirement that plaintiff must meet in this case, I apply federal law to determine whether Niemi has created a genuine issue of fact as to its entitlement to declaratory relief for future remedial action costs at the Hiway Service Station.

"Whether declaratory relief is appropriate depends upon 'whether the facts alleged, under all circumstances, show that there is a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of declaratory

judgment.' A case is ripe where the essential facts establishing the right to declaratory relief have already occurred." *Boeing Co. v. Cascade Corp.*, 207 F.3d 1177, 1192 (9th Cir. 2000) (quoting *Wickland Oil Terminals v. Asarco, Inc.*, 792 F.2d 887, 893 (9th Cir. 1986)).

Niemi's complaint requested a declaratory judgment holding Exxon Mobil liable for future remedial action costs in proportion to their assessed liability at the Hiway Service Station. DEQ issued an NFA for the Hiway Service Station which states that further action will only be necessary if "new or undisclosed facts show that the cleanup does not comply with the referenced rules." (Carlton Decl. [34-2] Ex. 7 at 7.) Additionally, the NFA requires that "any future work in the contaminated areas of the property, including any sampling, management, and disposal of contaminated soil and groundwater must be performed in accordance with DEQ regulations and policies." (*Id.* [34-2].)

As the name suggests, however, the NFA does not require any further action; it merely provides that if any future work takes place in the contaminated areas or any new or undisclosed facts are discovered, further action may be required at that time. Niemi has not alleged that any work is currently planned for the contaminated area, and the possibility of "new or undisclosed facts" is too speculative to support a declaratory judgment. Thus, Exxon Mobil is entitled to summary judgment on Niemi's declaratory judgment claim regarding the Hiway Service Station.[1]

///

///

///

---

[1] I note the result would be no different under Oregon law. *See Morgan v. Sisters School Dist. No. 6*, ___ P.3d ___, 353 Or. 189, 2013 WL 179480, at *5 (Jan. 17, 2013) ("'This court consistently has held that courts cannot issue declaratory judgments in a vacuum; they must resolve an actual and justiciable controversy. To be justiciable, a controversy must involve a dispute based on present facts rather than on contingent or hypothetical events.'") (quoting *TVKO v. Howland*, 73 P.3d 905, 908 (Or. 2003)).

18 – OPINION AND ORDER

## CONCLUSION

For the foregoing reasons, plaintiff Niemi Oil Company's Motion for Summary Judgment [34] is DENIED. As discussed above, defendant Exxon Mobil Corporation's Motion for Summary Judgment [25] is DENIED in part and GRANTED in part.

DATED this   11th   day of March, 2013.

/s/ Michael W. Mosman
MICHAEL W. MOSMAN
United States District Judge